DENNIS K. BURKE
United States Attorney
District of Arizona

REID C. PIXLER
Assistant United States Attorney
Arizona State Bar Number 12850
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7537
reid.pixler@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>$400,000.00 in United States Currency,<br><br>Defendant. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff, United States of America, through its attorneys, DENNIS K. BURKE, United States Attorney for the District of Arizona and Reid C. Pixler, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

## **NATURE OF THE ACTION**

1.      The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 21 U.S.C. §§ 841(a)(1) and/or 846, which are offenses constituting "specified unlawful activity" under 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.

2.      The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because it was involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

1

3.     The defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

4.     The defendant currency is subject to forfeiture pursuant to 31 U.S.C. § 5332(c) because it was involved in, or is traceable to, a violation of, or conspiracy to violate, 31 U.S.C. § 5332(a)(1).

### JURISDICTION AND VENUE

5.     This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

6.     This Court will have *in rem* jurisdiction over the defendant upon the Court's issuance of an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), and the execution of said arrest warrant on the defendant pursuant to Supplemental Rule G(3)(c).

7.     Venue is proper in this district:

    a)    pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district; and

    b)    pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b), because the defendant was found in this district.

### THE DEFENDANT IN REM

8.     The defendant consists of $400,000.00 in United States currency ("defendant currency"), seized on October 2, 2008 from Dominic Bianco, at 5755 North 19th Avenue, Phoenix, Arizona.  The defendant currency is currently in the custody of the United States Department of the Treasury.

2

## FACTS

### First Attempted Transaction Involving the Defendant Currency

9.     On October 2, 2008, Rocky Marquez ("MARQUEZ") entered a Bank of America branch located at 8258 West Bell Road, Glendale, Arizona.

10.     He entered the bank carrying a blue plastic Dillard's department store shopping bag.

11.     The bag contained approximately $415,000.00 in United States currency.

12.     MARQUEZ attempted to exchange the currency for a cashier's check.

13.     When Bank of America employees asked MARQUEZ for two forms of identification he stated that he did not have any identification with him.

14.     MARQUEZ went out the car to get his girlfriend, Noemi Salas ("SALAS"), to complete the transaction.

15.     SALAS presented two forms of identification.

16.     SALAS was reluctant to give the bank her social security number.

17.     After stumbling over her social security number, SALAS finally gave it to a representative of the bank.

18.     MARQUEZ refused to disclose the source of the cash to bank employees.

19.     SALAS also refused to disclose the source of the cash.

20.     The bank refused to complete the financial transaction.

### Second Attempted Transaction Involving the Defendant Currency

21.     At approximately 2:00 p.m. on October 2, 2008 Dominic Bianco ("Dominic") entered a different Bank of America branch located at 7579 North 16th Street, Phoenix, Arizona.

22.     Dominic was carrying a plastic Dillard's department store shopping bag.

23.     The bag contained approximately $400,000.00 in United States currency.

24.     Dominic attempted to convert the cash into a cashier's check, payable to himself.

25.     The bank refused to complete the financial transaction and Dominic left the bank.

### Third Attempted Transaction Involving the Defendant Currency

26.     While agents were at the Bank of America branch located at 7579 North 16th Street, they were advised Dominic was at another Bank of America branch, located at 5755 North 19th Avenue, Phoenix, Arizona, attempting once again to convert the defendant currency into a cashier's check.

27.     Agents responded to the 19th Avenue branch where they met with Dominic and his son, Christopher Bianco ("Christopher").

28.     The Biancos stated that they were attempting to convert the cash into a cashier's check for a client of their real estate firm who was conducting a cash purchase of a property through them.

29.     The Biancos told agents that the defendant currency belonged to MARQUEZ who was the buyer of the property.

30.     The Biancos stated that this was their third transaction of this type with MARQUEZ.

31.     The Biancos advised agents that MARQUEZ was waiting outside the bank.

32.     They indicated that they were supposed to ride with MARQUEZ to the title company to complete the property purchase.

33.     Agents exited the bank and found MARQUEZ and SALAS waiting in a black Cadillac Escalade bearing temporary license plate number 127916B.

### Interview of Rocky MARQUEZ

34.     Immigration and Customs Enforcement ("ICE") Group Supervisor Socrates Papadopoulos ("GS Papadopoulos"), and Senior Special Agent Dana Aguilar ("SSA Aguilar"), interviewed  MARQUEZ in the bank parking lot.

35.     MARQUEZ told agents that the defendant currency belonged to him.

36.     He stated that the defendant currency was part of approximately $500,000.00 obtained from the cash sale of a family property in Puerto Penasco, Mexico.

4

37.    MARQUEZ stated that the Puerto Penasco property was a cash sale conducted in Mexican Pesos.

38.    He indicated that the Pesos were converted to United States currency at an exchange house in Mexico.

39.    MARQUEZ admitted to bringing the defendant currency into the United States from Mexico approximately two weeks prior to October 2, 2008.

40.    MARQUEZ stated that the defendant currency was concealed in a vehicle in which he was a passenger when it crossed the border into the United States.

41.    The defendant currency was transported through the Lukeville, Arizona Point of Entry.

42.    MARQUEZ did not file a report regarding his importation of the defendant currency.

43.    MARQUEZ stated that he retained the Biancos in order to purchase a property in South Phoenix.

44.    He stated that the $400,000.00 was for that purchase.

45.    MARQUEZ stated that he was going to go to the title company later in the day.

46.    MARQUEZ provided agents with a Residential Real Estate Purchase contract.

47.    The contract listed the buyer as "DTC Investments."

48.    The contract listed the sellers as Joyce Williams ("Joyce") and Sherlon Williams ("Sherlon").

49.    The contract was signed by Christopher Bianco of DTC Investments and had not yet been signed by the seller.

50.    MARQUEZ stated that he did not know why the contract did not list him as the buyer.

51.    MARQUEZ stated that the paperwork for the sale of his property in Puerto Penasco was at his residence and he would provide that information to agents.

52.     MARQUEZ has never provided any such documentation to agents.

**Dog Alert on Defendant Currency**

53.     Phoenix Police Officer, M. Brooks ("Officer Brooks") responded to the Bank of America branch on October 2, 2008 at approximately 4:00 p.m. with his canine "Rudy."

54.     Rudy is a four-year-old Belgian Malinois and has been a drug detection dog since approximately August 2007.

55.      Rudy was first certified by the National Narcotic Detector Dog Association, Incorporated, on August 14, 2007.

56.     Rudy first received a Narcotics Certification by the National Police Canine Association on February 7, 2007, and was re-certified on November 26, 2007, January 15, 2008, and January 25, 2009.

57.     Rudy is trained to detect the odors of marijuana, methyl benzoate (a byproduct of cocaine), heroin, and methamphetamine.

58.     Upon the detection of one or more of these odors, Rudy demonstrates an active/aggressive alert.

59.     Bank of America employees took Officer Brooks and Rudy into a room in the bank.

60.     Before placing the defendant currency in the room, Officer Brooks allowed Rudy to inspect the room.

61.     Rudy did not alert to anything in the room.

62.     Special Agent Teri Hamel ("SA Hamel") and a bank employee took a cardboard box from the room that Rudy had just cleared and brought it to another room where they transferred the defendant currency from the plastic Dillard's bag into the box.

63.     SA Hamel and GS Papadopoulos noted the strong odor of marijuana as the currency was being transferred.

64.     The box was sealed with tape and placed in the room that was cleared earlier by Rudy.

65.     The box was placed along a wall in the room with other boxes.

66.     As Rudy proceeded through the room, he began to paw and scratch at the box containing the defendant currency, giving an active/aggressive alert as to one or more of the odors he is trained to detect.

### Joyce and Sherlon Williams

67.     Agents interviewed Joyce and Sherlon Williams on October 3, 2008.

68.     MARQUEZ contacted Joyce approximately two or three months earlier in response to the, "for sale by owner," sign on their industrial property located at 3407 and 3411 West Lincoln Street in Phoenix.

69.     After negotiating, Sherlon agreed to sell the property to MARQUEZ for $440,000.00 with $25,000.00 in nonrefundable earnest money.

70.     MARQUEZ told Sherlon that he did not have a realtor and wanted to pay cash for the property.

71.     Sherlon wanted to meet MARQUEZ at a bank to have the cash converted into a cashier's check.

72.     On September 24, 2008, Joyce, Sherlon and MARQUEZ signed a Real Estate Sale and Purchase Agreement.

73.     MARQUEZ subsequently met Joyce and Sherlon at a Bank of America branch and gave them $25,000.00 in cash.

74.     MARQUEZ called Joyce at approximately noon on October 2, 2008 and stated that he had an investor who would like to purchase the property.

75.     Joyce and Sherlon initially agreed to allow the investor purchase the property.

76.     At approximately 3:30 p.m. on October 2, 2008, SALAS called Joyce stating that she wanted Joyce and Sherlon to meet her at the bank to complete the transaction.

77.     Joyce had second thoughts about the transaction and explained to SALAS that they were going to have to cancel the contract.

### Interview with Dominic Bianco and Christopher Bianco

78.     The Biancos own DTC Investments, Incorporated ("DTC").

79.     Through DTC, the Biancos purchase homes, remodel them and sell them.

80.     MARQUEZ used DTC to purchase multiple properties in the Phoenix Metropolitan Area.

81.     The first time Christopher spoke with MARQUEZ was in regard to the purchase of one of DTC's properties located at 2225 West Columbine, in Phoenix, Arizona.

82.     Christopher informed MARQUEZ that the selling price of the home was $225,000.00.

83.     MARQUEZ agreed to buy the property.

84.     MARQUEZ initially came to the Biancos with a check for approximately $38,000.00 to $39,000.00 from Tiffany's Jewelers.

85.     MARQUEZ wanted Christopher to accept this check as part of the purchase price for the house.

86.     Christopher asked MARQUEZ why he did not just deposit the check into his bank account.

87.     MARQUEZ stated that he did not have a bank account.

88.     Christopher refused to take the check from MARQUEZ.

89.     MARQUEZ later met Christopher with a suitcase full of money for the purchase of the house.

90.     They decided to conduct the transaction in two parts.

91.     MARQUEZ met the Biancos at a bank and gave them $165,000.00 in cash to pay off the lender.

8

92.     A couple of days later, MARQUEZ brought an additional $50,000.00 in cash to the Bianco's at their office.

93.     They did not put any of the funds through an escrow account.

94.     MARQUEZ contacted Christopher approximately six weeks later regarding another property he was interested in purchasing located at 16021 North 37th Avenue, Phoenix, Arizona ("37th Avenue").

95.     The sale price of that house was $455,000.00.

96.     The purchase was conducted in such a manner that MARQUEZ gave the Biancos the cash to purchase the property.

97.     The Biancos then gave the seller of the 37th Avenue property one of their properties worth $160,000.00 along with an additional $295,000.00 in cash.

98.     MARQUEZ asked that the Biancos place the deed to the property in the name of his brother, Eddie Marquez.

99.     Christopher dealt with MARQUEZ a third time when MARQUEZ wanted to purchase the piece of conjoining industrial property located at 3407 and 3411 West Lincoln Street.

100.    MARQUEZ wanted to do the same type of property trade as was done with the 37th Avenue property.

101.    The sellers would not accept that offer.

102.    MARQUEZ offered to buy an investment property from the Biancos if they would purchase the Lincoln Street properties for him.

103.    The Biancos agreed to this arrangement.

104.    MARQUEZ once again brought cash to complete the transaction.

105.    Christopher asked MARQUEZ the source for all of his money.

106.    MARQUEZ told Christopher that it came from the sale of a property in Rocky Point, Mexico.

107.    Prior to that, MARQUEZ had indicated that he made a lot of cash dealing in auto parts.

108.    The day after ICE agents seized the $400,000.00 in cash at the bank, MARQUEZ called the Biancos to say that he had another $400,000.00 and would like to try to buy the Lincoln Street property again.

109.    Christopher explained that he and his father were not willing to do business with MARQUEZ at that time.

**Interview with Sabrina Rosas**

110.    Rosas is MARQUEZ' ex-girlfriend.

111.    Rosas and MARQUEZ were together from approximately October 2006 through May 2007.

112.    During that time, MARQUEZ' only employment was when he worked for his uncle at Advance Line Solutions for two months.

113.    MARQUEZ always had money, but no known source of income.

114.    MARQUEZ owned a 2005 BMW 6 series and a 2008 Cadillac Escalade.

115.    Rosas ended her relationship with MARQUEZ because he traveled too much.

116.    During their relationship MARQUEZ frequently traveled to Mexico, Michigan and Kentucky.

117.    Rosas was with MARQUEZ on several occasions when they crossed the United States/Mexico border.

118.    They used different vehicles to cross the border including Rosas' 2002 GMC Yukon Denali ("2002 Denali").

119.    Rosas and MARQUEZ crossed the United States/Mexico border in Rosas' 2002 Denali five times between March 20, 2007 and April 28, 2007.

120.    Rosas and MARQUEZ often traveled to Puerto Penasco, Mexico.

121.    MARQUEZ met with people in Puerto Penasco while Rosas stayed at the hotel.

10

1    122.   Investigation disclosed that MARQUEZ recruited homeless people to drive load

2    vehicles containing controlled substances over the border into the United States.

3    123.   Rosas and MARQUEZ would travel in the vehicle either leading or following the

4    load vehicle.

5                                      **Chadley Shadduck**

6    124.   On April 28, 2007, as Rosas and MARQUEZ crossed the border from Mexico into

7    Lukeville, Arizona they noticed Customs and Border Protection ("CBP") officers stop a 2002

8    Chevrolet Silverado ("2002 Silverado") towing a 2007 Pace Trailer ("camping trailer").

9    125.   Rosas and MARQUEZ parked across the street and watched from a restaurant as

10   CBP agents discovered a controlled substance in the camping trailer.   Rosas observed

11   MARQUEZ become angry.

12   126.   The driver of the 2002 Silverado was Chadley Shadduck ("Shadduck").

13   127.   561 kilograms of marijuana was concealed in the camping trailer.

14   128.   Shadduck was arrested for drug smuggling.

15   129.   Shadduck stated that on April 26, 2007, he was approached by an individual named

16   "Tony," whose last name he did not know.

17   130.   "Tony" asked Shadduck if he would be willing to drive a pick-up truck to Phoenix

18   in exchange for a 1985 Oldsmobile Cutlass.

19   131.   Shadduck agreed.

20   132.   Rosas owned a 1985 Oldsmobile Cutlass at the time.

21   133.   On April 27, 2007, "Tony" contacted Shadduck and asked him if he wanted to go

22   to Mexico and have a good time.

23   134.   "Tony" and his girlfriend picked up Shadduck and his girlfriend and traveled to

24   Mexico.

25   135.   When they were returning to the United States, "Tony" told Shadduck to cross the

26   border in the pick-up truck and "Tony" would be following him in another vehicle.

27

28

### Gary Garrett

136.   On May 8, 2007, ICE agents arrested Gary Raymond Garrett ("Garrett") who attempted to smuggle 567 kilograms of marijuana through the Lukeville Port of Entry.

137.   Garrett identified MARQUEZ as the person who recruited him to transport the drugs across the border.

138.   Garrett knew MARQUEZ as "Tony."

139.   Garrett was paid to help transport drugs over the border four times during a six-month period.

### Additional Seizures

### Peoria, Arizona Contact

140.   On March 26, 2008, Officer Lance Chedester ("Officer Chedester") of the Peoria Police Department, conducted a traffic stop on a white BMW, bearing Arizona license plate number 712YEL, for failing to use the turn signal when changing lanes, making an improper left turn and having an expired registration.

141.   The vehicle was registered to a Humberto Vargas Delgado, but MARQUEZ was identified as the driver of the BMW.

142.   The passenger of the BMW identified herself as Lucia SALAS, who is also known as Noemi SALAS.

143.   Officer Chedester noticed that there were three large stacks of currency tied together with rubber bands in the back seat of the BMW.

144.   Officer Chedester asked where MARQUEZ from where he was traveling. MARQUEZ stated that he had just taken the passenger to a house and he was on his way back home.

145.   MARQUEZ also told Officer Chedester that he was in the process of purchasing the BMW.

146.   When questioned about the currency in the backseat of the BMW, SALAS told Officer Chedester that she was picking it up for her mother who had just sold a car.  SALAS claimed her mother was in Mexico.

147.   SALAS explained that she did not know how much money she was supposed to be picking up.

148.   MARQUEZ gave Officer Chedester permission to search the vehicle.

149.   Officer J. Larson ("Officer Larson") from the Buckeye Police Department was called to the scene with his canine.

150.   The canine alerted to the trunk, the backseat and the currency that was discovered in the backseat of the BMW.

151.   During the contact officers located $15,000.00 in United States currency in the backseat of the BMW.

152.   Both MARQUEZ and SALAS gave conflicting stories about the origin and ownership of the currency.

153.   MARQUEZ claimed that he was going to purchase the BMW, but had not completed the transaction.

154.   SALAS claimed that the money found in the BMW was currency that they picked up from an unknown person who had just purchased a vehicle from her mother.

155.   SALAS stated that she did now know how much currency she had picked up for her mother, it could have been ten to fifteen thousand.

156.   The $15,000.00 in United States currency was forfeited by the Peoria Police Department.

**Detroit, Michigan Contact**

157.   On May 7, 2008, MARQUEZ and SALAS were seen exiting a Comfort Inn hotel with a male, identified as Jeremiah Daniel Ari Howard ("Howard").

158.   The Comfort Inn was located in Detroit, Michigan.

159.   Detroit is a known drug destination/distribution city.

13

160.   MARQUEZ, SALAS and Howard exited the hotel with luggage that consisted of a blue duffel bag, a black duffel bag, a black roller bag, a red duffel bag and a black computer bag.

161.   All of the luggage was placed into a 2000 Ford Excursion ("2000 Excursion").

162.   MARQUEZ, SALAS and Howard got into the vehicle and went to a restaurant.

163.   At the restaurant, MARQUEZ, SALAS and Howard met with another individual identified as Israel Jesus Chavarria ("Chavarria").

164.   On May 8, 2008, MARQUEZ and SALAS drove to a local parking lot and parked beside a 2001 Chevrolet truck.

165.   The 2001 Chevrolet truck was driven by Brian Kevin Tackett ("Tackett").

166.   MARQUEZ and SALAS went back to the Courtyard Marriott where they were staying and Tackett went to a Best Western where he was staying.

167.   MARQUEZ and Howard later left the hotel and drove to a store and purchased two black roller-type suitcases.

168.   MARQUEZ and Howard drove back to the hotel and entered it with the two suitcases they just purchased.

169.   On May 9, 2008, at approximately 5:00 a.m., Tackett exited the Best Western hotel with a duffel bag and entered his vehicle.

170.   At approximately the same time, MARQUEZ, SALAS, Howard, and Chavarria exited the Courtyard Marriott with luggage that consisted of one black bag, two red bags and two small roller-type bags.

171.   All of the bags were placed in the 2000 Excursion.

172.   SALAS, who was driving the 2000 Excursion, drove to the Best Western parking lot and met with Tackett.

173.   Howard and Chavarria then loaded the two black roller-type bags into the 2004 Open Road camping trailer that was attached to the 2001 Chevrolet truck driven by Tackett.

14

174.   Inside the camper, MARQUEZ, SALAS, Howard, and Chavarria extended the slide-out on the side of the camper that was on rails, and proceeded to moved several items and bags around.

175.   The slide-out was then pulled back in and both vehicles left the Best Western parking lot.

176.   At approximately 6:22, Officer Thomas Konarski ("Officer Konarski") of the Taylor Police Department conducted a traffic stop on the 2001 Chevrolet for improper lane use.

177.   The vehicle was driven by Tackett.

178.   Tackett provided Officer Konarski with his driver's license and registration.

179.   Tackett stated that he was coming from the Best Western hotel in Woodhaven.

180.   When asked how long his stay had been in Michigan, Tackett told Officer Konarski that he was in Michigan for only one day to see his daughter.

181.   Officer Konarski asked Tackett for permission to search both his truck and camping trailer.

182.   Tackett gave consent to Officer Konarski to search the truck and camping trailer.

183.   Tackett, the 2001 Chevrolet, and the camping trailer were then transported to the Woodhaven Police Department ("WPD") for further investigation.

184.   At the WPD, Officers extended the slide-out portion of the camping trailer and removed some screws in the floor in order to gain access to a hidden compartment.

185.   In the hidden compartment were two black roller-type bags.

186.   Inside the bags, officers found 27 heat sealed bundles of United States currency which totaled $874,356.00.

187.   Tackett told officers that he did not know that the currency was in the suitcases.

188.   Tackett signed a Disclaimer of Ownership of the currency.

189.   Task Force Agent Joseph Nehs ("TFA Nehs") conducted an interview with Tackett at the WPD.

15

190.   Tackett stated that he was contacted in Phoenix and told to go to a Walmart or Home Depot to pick up a 2001 Chevrolet that had a camping trailer attached to it.

191.   He then drove the truck and camping trailer to Detroit and was instructed by MARQUEZ to wait for instructions.

192.   Tackett stated that he arrived in Detroit on May 6, 2008.

193.   Tackett told TFA Nehs that MARQUEZ instructed him to check into a hotel in the area and that he would meet with him to pick up something.

194.   Tackett waited in the hotel parking lot for MARQUEZ to arrive and was told to stay in the vehicle while the others did something in the camping trailer.

195.   When TFA Nehs asked Tackett what he was supposed to be picking up, Tackett replied, "it can only be one of two things, drugs or money."

196.   Tackett stated that he has made three trips like this to Detroit.

197.   On May 9, 2008, at approximately 6:40 a.m. Officer Jeffrey Adamisin ("Officer Adamisin") conducted a traffic stop on a 2000 Excursion for littering.

198.   Officer Adamisin approached the vehicle and identified the driver as MARQUEZ.

199.   MARQUEZ provided Officer Adamisin with his driver's license, but stated that he did not have the vehicle registration information.

200.   MARQUEZ claimed that the vehicle belonged to a friend of his in Kentucky.

201.   When asked how long he had been in town, MARQUEZ stated that it had been about a week.

202.   MARQUEZ was asked what his business was in town to which he replied, "uh...uh."

203.   MARQUEZ then pointed to Howard who was sitting the backseat and stated that they had all come from Kentucky to see his buddy's brother.

204.   Officer Adamisin then asked MARQUEZ what city his brother's buddy lived in and MARQUEZ replied, "uh....uh, I think it was Southfield."

16

205.   Officer Adamisin asked MARQUEZ where he was going.  MARQUEZ replied, "going back to Arizona, I mean Kentucky."

206.   Because of the inconsistencies in MARQUEZ' story, all of the occupants of the 2000 Excursion were then taken to the WPD for further investigation.

207.   SALAS was interviewed by Task Force Agents Henry Wilson ("TFA Wilson") and Radken Smith ("TFA Smith").

208.   SALAS told agents that the large tan checkered purse that was found in the front passenger seat of the vehicle was hers.

209.   She was asked if she objected to the agents searching her purse to which she stated, "no."

210.   Upon opening the purse, agents retrieved $17,927.00 in United States currency.

211.   SALAS stated that the money was placed in her purse.

212.   SALAS told officers that MARQUEZ placed the money in her purse.

213.   SALAS signed a Disclaimer of Ownership of the currency.

214.   TFA Wilson interviewed MARQUEZ.

215.   When asked, MARQUEZ told TFA Wilson that he had some currency on him and removed it from his pocket.

216.   $1,105.00 in United States currency was taken from MARQUEZ' person.

217.   Officer T. Westhoff ("Officer Westhoff"), of the Romulus Police Depart was called to the scene with his canine.

218.   Officer Westhoff's canine gave a positive alert to the $874,356.00, $17,927.00 and $1,105.00 in United States currency.

219.   The currency was forfeited by the WPD.

**Oklahoma Contact**

220.   On April 24, 2009, MARQUEZ, SALAS and Adam Escudero ("Escudero") were stopped in a black 2008 Cadillac Escalade by the Oklahoma Bureau of Narcotics and Dangerous Drug Control ("OBN") for following to closely to another vehicle.

221.   OBN agents identified MARQUEZ as the driver of the vehicle.

222.   The passengers were identified as SALAS and Escudero.

223.   Agent Diaz noticed that MARQUEZ' face was pale.

224.   SALAS would not make eye contact with Agent Diaz.

225.   MARQUEZ was asked to exit the vehicle, while the other passengers remained inside.

226.   MARQUEZ told Agent Diaz that he was traveling with his fiancé and brother-in-law.

227.   MARQUEZ was informed that he would be issued a warning for the violation.

228.   MARQUEZ was very vague about the purpose of his trip.

229.   MARQUEZ told Agent Diaz that the vehicle belonged to his brother Eddie, but also stated in the same sentence that his brother Eddie had helped MARQUEZ finance the vehicle.

230.   Agent Diaz received word that MARQUEZ' driver's licence was suspended.

231.   It was explained to MARQUEZ that he was no longer eligible to drive and that no action was going to be taken as long as one of the other two passengers had a valid driver's license.

232.   Agent Diaz returned to the vehicle as asked both SALAS and Escudero for their driver's license.

233.   All of the occupants' stories were inconsistent with each other.

234.   MARQUEZ gave OBN agents consent to search the vehicle.

235.   During the search, agents noticed that there had been some tampering on the spare tire mounted on the undercarriage of the vehicle.

236.   When the spare tire was removed, agents took the tire off of the rim and found $722,156.00 in United States currency heat sealed and rubber-banded together.

237.   MARQUEZ, SALAS, and Escudero were placed in the agent's vehicle while they conducted a search of the vehicle.

238. When the agents removed the spare tire from the undercarriage and began to look inside the rim, MARQUEZ was seen and heard on an in-car audio and video system saying, "okay, here we go."

239. MARQUEZ signed a Disclaimer of Ownership form, stating that he had no knowledge or claim to the currency.

240. SALAS also signed a Disclaimer of Ownership form, stating that she had no knowledge or claim to the currency.

241. Escudero signed a Disclaimer of Ownership form as well, stating that he had no knowledge or claim to the currency.

242. Also found in the vehicle were four cellular telephones and one Ipod media device, which were all subsequently seized.

243. MARQUEZ, SALAS and Escudero were all transported to OBN headquarters.

244. The 2008 Cadillac and the currency were transported to OBN headquarters as well.

245. While at OBN headquarters, Agent Diaz presented his canine, "Jake," to scan the currency.

246. Jake gave a positive alert to the heat sealed bags.

247. The currency was forfeited by the OBN.

### Reported Wages

248. Between January of 2005 and December of 2008, MARQUEZ reported to the Arizona Department of Economic Security ("DES") that he earned $324.00 in the third quarter of 2006 and $3,099.00 in the fourth quarter of 2006.

### FIRST CLAIM FOR RELIEF

249. Plaintiff repeats and realleges each and every allegation set forth in paragraph 1 through 248, above. Based on the aforementioned facts and circumstances, because the property constitutes or is derived from proceeds traceable to a violation of, or conspiracy to commit a violation of, 21 U.S.C. §§ 841 and/or 846, which are offenses constituting "specified unlawful

activity" under 18 U.S.C. § 1956(c)(7).  It is, therefore, subject to forfeiture to the United Stats pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

250.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 249, above.  Based on the aforementioned facts and circumstances, because the defendant currency was involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or is traceable to such property, it is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

251.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 250, above.  Based on the aforementioned facts and circumstances, the defendant currency was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. It is, therefore, subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## FOURTH CLAIM FOR RELIEF

252.    Plaintiff repeats and realleges each and every allegation set forth in paragraph 1 through 251, above.  Based on the aforementioned facts and circumstances, the defendant currency is subject to forfeiture pursuant to the provisions of 31 U.S.C. § 5332(c) as currency involved in a violation of 31 U.S.C. § 5332(a) or a conspiracy to commit such a violation, to wit: currency in an amount greater than $10,000.00 was concealed on the person of an individual or in a conveyance, article of luggage, merchandise, or other container and was transported and transferred from a place outside the United States to a place within the United States with the intent to evade the currency reporting requirements of 31 U.S.C. § 5316.

1   WHEREFORE, the United States of America prays that process of warrant *in rem* issue

2   for the arrest of the defendant; that due notice be given to all parties to appear and show cause

3   why the forfeiture should not be decreed; that judgment be entered declaring the defendant be

4   forfeited to the United States of America for disposition according to law; and that the United

5   States of America be granted such other and further relief as this Court may deem just and

6   proper, together with the costs and disbursements of this action.

7   RESPECTFULLY SUBMITTED this 22nd day of December, 2009.

8

9   DENNIS K. BURKE
    United States Attorney
10   District of Arizona

11

    s/Reid C. Pixler
12   REID C. PIXLER
    Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28